**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CAPGEMINI FINANCIAL SERVICES USA INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 14 C 464 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| INFOSYS LIMITED, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court now is an emergency motion filed by the plaintiff, Capgemini Financial Services USA Inc. ("Capgemini"), seeking a temporary restraining order ("TRO") and preliminary injunction against its competitor, defendant Infosys Limited ("Infosys"). Capgemini believes that Infosys is raiding its VisionPLUS employees in order to misappropriate the practice. Capgemini seeks to prevent Infosys from employing Capgemini's employees that have worked for a common client of Capgemini and Infosys, First Data Corporation ("First Data"), and to prevent former Capgemini employees who are now employed by Infosys from using confidential Capgemini information and soliciting or providing services to First Data in their work at Infosys. For the reasons explained below, Capgemini's motion for a temporary restraining order and preliminary injunction is denied as to the temporary injunction.

**DISCUSSION**

Capgemini, an information technology ("IT") consulting company, provides business and IT services for the global financial services industry. It alleges that one of its most valuable practice groups is the VisionPLUS practice group. VisionPLUS is a software application owned

by First Data that is used in credit card transactions. Capgemini's VisionPLUS practice provides two primary types of services. First, Capgemini provides services to First Data directly to support hosting the VisionPLUS software; these services involve several discrete support teams. Second, Capgemini provides services directly to First Data's customers—banks who license the software and use Capgemini for IT support. At issue in this case is Infosys's own VisionPLUS practice, which is staffed in part by former Capgemini employees. Capgemini argues that Infosys is wrong to staff former Capgemini employees on First Data projects because to work on those projects, the former Capgemini employees would violate the confidentiality and nonsolicitation provisions of their Capgemini employment agreements. Capgemini claims that Infosys is interfering with its contracts with its current and former employees, interfering with its business relationship with First Data, and misappropriating its confidential information and trade secrets.

"A temporary restraining order or a preliminary injunction is an extraordinary and drastic remedy, which should not be granted unless the movant carries the burden of persuasion by a clear showing." *Recycled Paper Greetings, Inc. v. Davis*, 533 F. Supp. 2d 798, 803 (N.D. Ill. 2008) (citing *Goodman v. Illinois Dept. of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005)). Capgemini has not made a sufficient showing in support of its motion to show that an immediate TRO is warranted. The standard governing temporary restraining orders is the same as that for preliminary injunctions. *Lee v. Orr*, 13-CV-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) (citation omitted). In determining whether to grant injunctive relief, courts consider whether the moving party has demonstrated: (1) some likelihood of success on the merits, (2) there is no adequate remedy at law, and (3) irreparable injury will occur without obtaining the relief sought. *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d

6, 11 (7th Cir. 1992). If the moving party meets these requirements, courts then balance the harm to the non-moving party if injunctive relief is granted against the harm to moving party if relief is denied. *Planned Parenthood of Indiana, Inc.*, 699 F.3d at 972. The Seventh Circuit uses a sliding scale when weighing the harm to a party against the merits of the case. "The more likely it is that [the moving party] will win its case on the merits, the less the balance of harms need weigh in its favor." *Id.* (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008)). Finally, courts consider the public interest involved, including the effects of the injunctive relief on non-parties. *Id.*; *Credit Suisse First Boston, LLC v. Vender*, 2004 WL 2806191, at *1 (N.D. Ill. December 3, 2004).

Before determining whether Capgemini has carried its burden of proving some likelihood of success on the merits of its claims, the Court must determine the elements of those claims. This case is before the Court on the basis of diversity jurisdiction.[1] A federal district court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also CSX Transp., Inc. v. Chicago & N. W. Transp. Co., Inc.*, 62 F.3d 185, 188 (7th Cir. 1995). This complaint lays out a variety of tort actions. Illinois applies a "most significant relationship" test to determine the law governing tort actions. *See Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 865 (7th Cir. 2010); *see also Jackson v. Cadence Design Sys., Inc.*, 54 F. Supp. 2d 834, 835 (N.D. Ill. 1999) (citing *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 503–04 (7th Cir. 1998)). While that test points to the law of the jurisdiction in which the tort occurred as the governing law, "a tort can't be said to occur until an injury is

---

[1] The plaintiff, Capgemini, is an Illinois corporation with its principal place of business in Rosemont, Illinois. Compl. ¶ 5, Dkt. 1. The defendant, Infosys, is an Indian corporation with its headquarters—the Court interprets this to mean principal place of business—in Bangalore, India. Compl. ¶ 6; Def.'s Mem Ex. A ¶ 2, Dkt. 19-1. The complaint alleges damages in excess of the $75,000 threshold established by 28 U.S.C. § 1332(a). Compl. ¶ 7.

produced." *McNeil Consumer Healthcare*, 615 F.3d at 865. The *lex loci delicti* of the torts alleged in the complaint is Illinois, meaning that Illinois law governs the tort claims, contrary to Infosys's arguments to the contrary.

Turning to the trade secrets claim first,[2] Capgemini has failed to provide any evidence that its former employees are using Capgemini's trade secrets, and so has not demonstrated any likelihood of success on the merits of this claim. In a claim under the Illinois Trade Secrets Act, a plaintiff must establish: (1) the existence of a trade secret; (2) the misappropriation of the trade secret; and (3) the use of the trade secret in the defendant's business. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir. 1992). A trade secret is defined by statute as:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are

---

[2] The complaint includes one count that alleges violations of the Illinois Trade Secrets Act (Count 3) and one that alleges "unfair competition" (Count 6). "[I]n Illinois, the common law tort of unfair competition encompasses a 'broad spectrum of law' and it is difficult to determine exactly what elements are required in order to prove such a claim." *LG Electronics v. Whirlpool Corp.*, 08 C 242, 2010 WL 3521785, at *2 (N.D. Ill. Sept. 1, 2010) (quoting *Integrated Genomics, Inc. v. Kyrpide*, No. 06 C 6706, 2008 WL 630605, *13 (N.D. Ill. 2008). In Illinois, this "elusive" claim has been analyzed under the rubrics of, alternatively, tortious interference with prospective business expectancy (which is the claim alleged in Count IV of the complaint) or the Uniform Deceptive Trade Practices Act ("UDTPA"). *See id.*; *BlueStar Mgmt. v. The Annex Club, LLC*, 09 C 4540, 2010 WL 2802213, at *9 (N.D. Ill. July 12, 2010). Here, it is also possible that Capgemini intends a tortious interference with contract claim related the alleged breach the confidentiality provisions in Capgemini's employment contracts. In any event, Capgemini does not allege any consumer fraud or deceptive trade practices to support a common law unfair competition claim under the rubric of the UDTPA, therefore the Court focuses on the elements of a trade secrets claim here and addresses the tortious interference claims separately.

>reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. 1065/2. The Capgemini employment agreements define confidential information to include "any trade secret, or proprietary or confidential information . . . including, but not limited to proprietary or confidential information respecting inventions, products, designs, methods, know-how, techniques, systems, processes, strategies, software programs."

Capgemini has not identified any specific proprietary information or trade secrets at risk under any definition; it instead generally argues that its expertise, processes, and methodology constitute protectable information. It is well settled that protecting confidential operational and customer information is a legitimate, protectable interest of an employer. *See Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 880 N.E.2d 188, 200 (Ill. App. Ct. 2007). Still, "[i]t is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Van Der Woude*, 962 F.2d at 1266. Furthermore, employees working in a competitive market "must be entitled to utilize the general knowledge and skills acquired through experience in pursuing [their] chosen occupation." *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 331 Ill. App. 3d 777, 791, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002); *see also American Hardware Mut. Ins. Co. v. Moran*, 545 F. Supp. 192, 198 (N.D. Ill. 1982) (applying Illinois law) ("[A]n employee cannot be forced to erase from his mind all the knowledge and skills that he acquired during prior employment . . . . [The plaintiff] has failed to demonstrate any information communicated during the training process was of a confidential or secret nature."). Absent specific examples of the types of information it asserts are at risk here, Capgemini has given no basis on which to distinguish between information generally known in the industry and acquired through experience from protectable information or concrete secrets. Nor has Capgemini explained why proprietary information about working with and servicing

First Data's VisionPLUS system would belong to Capgemini (and not, say, to First Data).[3] Capgemini's vague, conclusory statements that its expertise and procedures generally rise to this level are insufficient to carry its burden (even its lesser burden of showing some likelihood of success) on these claims.

Moreover, even if Capgemini had adduced some evidence that it has a protectable interest in information and processes developed in relation to First Data's systems, it still has not produced any evidence that its former employees have made use of that information in the course of their work for Infosys. In response to this question at the TRO hearing on January 28, 2014, Capgemini could point only to a sole paragraph of a declaration, *submitted by Infosys*, of Chandra Nandahumar, the Infosys Practice Leader of the Cards and Payment Practice. Nandahumar stated: "In addition to any ancillary training they may have received from Capgemini, the [former Capgemini employees] acquired their [VisionPLUS] platform knowledge and expertise using [First Data] intellectual property, including product manuals, coaching and on the job mentoring provided by [First Data] Product Subject Matter Experts." Nandahumar Decl. ¶ 29, Dkt. 19-1. Nandahumar's statement does not even establish that Capgemini trained the former employees, but even assuming that such training took place, the statement does not establish that the training imported confidential information to the employees

---

[3] On this point, it is worth noting that the "Statement of Work" contract between Infosys and First Data includes provisions that require Infosys "setup a Knowledge Management (KM) CoE to assist Customer in the capture and retention of key knowledge assets including but not limited to operating procedure, manuals, operating materials and training materials," to provide that knowledge database to Infosys, and that Infosys retains exclusive ownership of "all rights, title and interest in the First Data Database, and all worldwide Intellectual Property Rights related thereto." It is reasonable to infer that this is a standard provision in First Data's contracts with consultants servicing its systems, including Capgemini; if so, it is difficult to understand how CapGemini would be able to assert a claim that processes and methodologies relating to work done for First Data is proprietary to First Data, not Capgemini. *Cf.* Nandahumar Decl. ¶ 26, Dkt. 19-1 (suggesting that First Data owns derivative work related to VisionPLUS).

or that the employees are using such confidential information now. In lieu of evidence, Capgemini argues that its former employees "must" have disclosed confidential training information because otherwise Infosys would not be capable of providing services to First Data. This argument does not survive scrutiny: Infosys has been doing First Data work since 2012 and secured additional First Data work in August 2013—before any of the employees at issue here went to work for Infosys. *See id.* ¶¶ 6, 10, 11. At the TRO hearing, Infosys indicated that only seven of approximately one hundred Infosys employees working on First Data VisionPLUS projects are former Capgemini employees. *See also id.* ¶ 24. In addition, Infosys has submitted an affidavit claiming that no confidential Capgemini information is being used in soliciting or doing business with Capgemini's customers or employees. *Id.* ¶ 30. While it is possible that Capgemini will be able to demonstrate some likelihood of success on the merits of this claim with a more developed evidentiary showing in connection with a preliminary injunction hearing, it has not shown enough thus far to warrant a TRO.

Capgemini also claims that, by "raiding" Capgemini's employees, Infosys has tortiously interfered with its business relationships with First Data and its employees. As to former, Capgemini similarly has not shown a likelihood of success on the merits of its claim. To establish tortious interference with prospective economic advantage under Illinois law, a plaintiff must show: (1) the plaintiff's had a reasonable expectation of entering into a valid business relationship; (2) the defendant had knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from being fulfilled; and (4) damages resulting from such interference. *Burrell v. City of Mattoon*, 378 F.3d 642, 652 (7th Cir. 2004) (citations omitted). Capgemini's long-running relationship with First Data, as well as the ongoing Master Services Agreement between Capgemini and First Data

suggests that Capgemini has a reasonable expectation of future business with First Data, but Capgemini has presented no evidence to suggest that such an expectation is exclusive to Capgemini or that any work obtained by Infosys is the result of anything other than fair competition. In other words, there is no evidence that the "raiding" that Capgemini alleges has caused Capgemini to lose any business. The evidence in the record thus far in fact suggests that Infosys's burgeoning First Data business is the result of First Data voluntarily retaining Infosys as the result of competitive bidding and not as a result of any sort of purposeful interference by Infosys. The "Statement of Work" contract between Infosys and First Data shows only that Infosys has won First Data work; it does not establish that it is doing so by unlawfully interfering. Indeed, as Infosys represented during the TRO hearing, it entered into the subject contract with First Data effective August 1, 2013, before any of the Capgemini employees referred to in the motion had gone to work for Infosys. *See* Nandahumar Decl. ¶ 21, Dkt. 19-1. Parties with prospective business relationships must allow for the rights of others, including their competitors. *See Fid. Nat. Title Ins. Co. of New York v. Westhaven Properties P'ship*, 386 Ill. App. 3d 201, 219, 898 N.E.2d 1051, 1068 (Ill. App. Ct. 2007) (citing *Romanek v. Connelly*, 324 Ill. App. 3d 393, 406, 753 N.E.2d 1062, 1073 (2001); *Belden Corp. v. InterNorth, Inc.*, 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 101 (1980)). Here, it appears that Infosys is taking actions that would enable it to fulfill its contract with First Data; Capgemini offers no evidence that suggests that it is purposefully acting to interfere with Capgemini's business and does not contest that Infosys acquired its own contract by a valid bid.[4] Finally, at the TRO hearing, the parties offered

---

[4] Furthermore, the Court notes that Infosys recruitment efforts targeting people with VisionPLUS experience appear to have been conducted in part with First Data's support or approval. *See* CG-3 (noting that solicitations of Capgemini employees have been made using infrastructure provided by First Data). First Data also asked Capgemini for relief from the restrictive covenants of three Infosys employees formerly employed by Capgemini—suggesting

the name of at least one other company that performs VisionPLUS work, undermining any inference that Capgemini may reasonably expect to be First Data's exclusive VisionPLUS contracter. While a more complete evidentiary showing may indicate unlawful interference by Infosys is the explanation for its growing First Data practice, Capgemini has not thus far established that it could prove such interference with any likelihood.

Capgemini's claim for tortious interference with its employment contracts is a closer call. Capgemini's employment contracts prohibit employees from "solitic[ing] or do[ing] business with" Capgemini customers that are "near-permanent" or with whom the employee had contact in their final year of employment for one year following the employee's date of termination. Compl. Exs. A-D ¶ 4(b), Dkt. 1-1 through 1-4. Assuming for the sake of this motion that these provisions are indeed enforceable (thus temporarily setting aside questions regarding the application of foreign law, as to which Capgemini's submissions in further proceedings will require substantial buttressing), Capgemini has still not met its burden of demonstrating that it will suffer irreparable injury if its motion for a TRO is denied. Capgemini has been investigating this matter and iteratively asserting itself against Infosys since September 2013. Stating that Inofosys was operating "with the obvious intention of assigning [the ex-Capgemini employees Infosys recruited] to perform services for First Data, in order to divert the first Data business and Capgemini's confidential information," Capgemini wrote to Infosys in October 2013 threatening legal action and identifying specific employees, potential violations and legal claims. In December 2013, Capgemini could be reasonably sure that its former employees were working on VisionPLUS matters for First Data in their new roles at Infosys. Still, this "emergency" motion for a TRO was not filed for another month. The Court notes as well that Capgemini still has not

---

that Infosys is not doing anything not requested, or sanctioned, by First Data, and that First Data itself is working to keep the market for VisionPLUS services competitive. *See* CG-1.

sought any legal redress against the specific employees it claims are violating the terms of their employment agreements. While the Court does not suggest that Capgemni has not been diligent in its efforts to address the violations it perceives, this timeline belies its argument the harm resulting from the alleged inducement of the breaches of the employment contracts is immediate or irreparable, as required to support granting a TRO. Capgemini acknowledges that it took a cautious approach to addressing these issues, and that approach has much to commend it, but it also undermines the assertion that it will suffer irreparable injury if no relief is granted before a preliminary injunction hearing can be held. The "common formula" is that TROs are intended to preserve the status quo only for so long as is needed to hold a hearing. *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006) (citing *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003)). Capgemini has not convinced the Court that barring seven former employees from working for Infosys on First Data assignments will cause it harm that cannot be remedied within the next 28 days (the longest period a TRO can remain in effect absent agreement) by entry of a preliminary injunction.

Capgemini argues that the "loss of business relationship with a customer constitutes irreparable harm" in light of the difficulty of rebuilding such relationships. Pl.'s Mot. 13, Dkt. 6. The evidence presented thus far, however, seems to suggest a somewhat gradual talent drain that has taken considerable time for Capgemini even to identify, not a rapidfire mission to pilfer Capgemini's VisionPLUS workforce *en masse*. Moreover, at issue are just seven employees out of thousands of Capgemini employees with VisionPLUS experience and one hundred Infosys employees working with VisionPLUS. *See* Nandahumar Decl. ¶¶ 23–24, Dkt. 19-1 (estimating that 4000 Capgemini employees have worked in Capgemini's VisionPLUS practice). Infosys has provided an affidavit that these seven employees were among forty-one people hired for their

VisionPLUS experience in the second half of 2013. *Id.* ¶ 17. While the email solicitation in Ex. CG-1 suggests that some of these particular individuals play a valuable and somewhat unique role in supporting VisionPLUS, the same exhibit shows that Capgemini has not lost First Data as a customer and in fact employs people who are capable of supporting VisionPLUS in an analogous way. The fact that the First Data employee inquired into the availability of a remaining Capgemini employee further suggests that Capgemini may be able to rearrange its own workforce to recapture some of the work it is losing. Whether First Data is, over time, growing to prefer the work or pricing of Infosys over Capgemini is a separate question; Capgemini has not provided evidence that suggests the employee transitions reflect anything but the result of Capgemini's loss of VisionPLUS work before any of the alleged breaches ever occurred. Capgemini has not demonstrated that Infosys has caused it any irreparable damage by hiring former Capgemini employees who are still subject to contractual employment restrictions.

\*   \*   \*

For the reasons set forth above, the Court denies Capgemini's motion for a temporary restraining order and preliminary injunction is denied as to the request for a temporary injunction.

Date: January 30, 2014

John J. Tharp, Jr.
United States District Judge